**A. S. BOYLE CO. v. HARRIS–THOMAS CO. et al.**
No. 4091.

District Court, D. Massachusetts.

Feb. 8, 1937.

178

George P. Dike, Cedric W. Porter, and Dike, Calver & Gray, all of Boston, Mass., for plaintiff.

Ellis Spear, Jr., of Boston, Mass., for defendant.

McLELLAN, District Judge.

This is a suit for infringement of the patent under which the plaintiff's preparation known as "plastic wood" is made and sold in the United States, patent No. 1,838,618, issued to Manfred Ethelwold Griffiths on December 29, 1931, upon an application filed on November 17, 1923. Proceedings in the Patent Office and in the Supreme Court of the District of Columbia occupied the years between the date of the application and the date of the issue.

Statements of fact and conclusions appearing herein may be taken as findings of fact and conclusions of law in accordance with the equity rules.

The defendants are Harris-Thomas Company and Low Supply Company. The plaintiff's brief makes no reference to the Low Supply Company, no evidence was introduced against it, and no claim was asserted at the trial against it, and as to this defendant the bill should be dismissed. Hereafter in this opinion when the defendant is referred to, it will be understood that the Harris-Thomas Company alone is meant.

The defenses are invalidity and noninfringement. The defendant offered no testimony on either issue, but in support of its allegations as to invalidity presented, as evidence of the prior art, a great number of patents and some excerpts from text-books and other publications.

The nature of the invention is thus stated in the specification:

"This invention relates to plastic compositions and has for its object to provide a plastic mass which may be used for many purposes, for example, for filling, coating or moulding, having properties not found in the usual filling and like compositions.

"The invention in brief consists in a plastic composition comprising a solution of nitro-cellulose, a resinous body and a non-drying oil in a ketonic liquor, to which solution a filler is added * * *

"The mixture is treated in a kneeding machine until it is of uniform consistency. It may then be employed for a number of purposes; for example, it may be used by pattern makers for filleting and similar work, by joiners and cabinet makers for filling screw and nail holes, shakes in timber, openings at joints and for preparing or repairing mouldings and carvings, or by shoemakers for building up or repairing lasts.

"A plastic composition prepared as described above hardens quickly when exposed to the air, adheres firmly to any clean dry foundation, does not blister or powder when exposed to moderate heat and is not affected by water, gasoline or other available liquids."

Ingredients suggested in the specification are celluloid scrap, castor oil, and ester gum, dissolved in industrial spirit, benzol, and acetone. To this solution wood flour is added. Various formulæ are given for the combination of these ingredients, and the limits within which the proportions may be varied are stated.

The claims in issue follow:

"5. A doughy, putty-like plastic composition comprising nitrocellulose in a solution containing a volatile liquid, and a finely divided cellulose filler in such proportions as to harden upon mere exposure to air to substantially the rigidity and solidity of wood.

"6. A doughy putty-like plastic composition comprising nitrocellulose in a solution containing a volatile liquid and a finely divided cellulose filler in such proportions as to harden upon mere exposure to air to substantially the rigidity and solidity of wood, said filler being present in not less than fifteeen parts by weight."

"8. A doughy putty-like plastic composition, comprising nitrocellulose in a solution containing a volatile liquid, a non-drying oil and a finely divided wood filler in such proportions as to harden upon mere exposure to air to substantially the rigidity and solidity of wood."

"11. A doughy putty-like plastic composition, comprising nitrocellulose in a solution volatile in part at least and containing a ketonic liquor, a non-drying oil, and a finely divided cellulose filler in such proportions as to harden upon mere exposure to air to substantially the rigidity and so-

lidity of wood, said filler being present in not less than fifteen parts by weight."

"13. A doughy putty-like plastic composition comprising nitrocellulose in a solution volatile in part at least and containing acetone, castor oil, a resinous body, and a finely divided cellulose filler in such proportions as to harden upon mere exposure to air to substantially the rigidity and solidity of wood."

"15. A doughy, putty-like plastic composition comprising nitro-cellulose in a solution containing a volatile liquid, a nondrying oil, and a resinous body, and a finely divided wood filler in such proportions as to harden upon mere exposure to air to substantially the rigidity and solidity of wood, said wood filler being present in not less than fifteen parts by weight.

"16. A doughy, putty-like plastic composition comprising nitro-cellulose in a solution containing a volatile liquid, a nondrying oil, and a resinous body, and a finely divided wood filler in such proportions as to harden upon mere exposure to air to substantially the rigidity and solidity of wood.

"17. A composition of matter for hole filling and filleting, which before exposure to the air is dough-like and putty-like, and contains finely divided wood, nitrocellulose and a volatile liquid, and after exposure to the air has a wood-like rigidity and solidity and is essentially finely divided wood held together by the nitrocellulose.

"18. A composition of matter for hole filling and filleting, which before exposure to the air is dough-like and putty-like and contains a volatile liquid, nitrocellulose, and about 15 to about 30 percent by weight of finely divided wood, and which after exposure to the air has a wood-like solidity and rigidity and is essentially the finely divided wood held together by the nitrocellulose."

In the combination described in these claims the nitrocellulose is the ingredient upon which all else depends. Without it there would be no plasticity and no hardening into the solidity of wood. Nitrocellulose, with which every one is familiar when it appears in the form of celluloid, is the result of treating cotton or other vegetable fiber in nitric acid or in a mixture of nitric acid and sulphuric acid. It may be reduced to a plastic mass by the use of a suitable solvent, and in this state it may be molded into any desired form and hardens permanently into that form upon

evaporation of the solvent. If applied in its plastic form, it will adhere firmly to almost any clean surface. These are the properties of nitrocellulose that the patentee employs. By mixing wood flour with plastic nitrocellulose he obtains a putty-like material which remains plastic until exposed to the air. Packed in air-tight cans or tubes it is available for use by the consumer very much as ordinary putty is used. It adheres to any wooden surface and solidifies quickly to the hardness of wood. Like wood, it may be sawed, whittled, planed, bored, painted, varnished, or treated in any way that wood might be treated.

"Plastic wood" has many uses. It was first produced in England to meet a demand from shoe manufacturers for a material with which shoemakers could restore the surface of shoe lasts when they became pitted with nail holes after repeated use. It is now in common use, not only by shoemakers, but by carpenters, painters, and boat repairers, and it is also much used for small repairs in the home.

The invention has been a commercial success. The plaintiff's president testified that the annual sales are about two and a half million units a year, a unit being either a can or a tube. It has had the flattery of imitation. During the years after it was put on the market and while the patent was pending, imitators flocked in with preparations under such names as Arco Synthetic Wood, Handy Wood, Dandee Wood Patch, Flex Wood, Patch Wood, Patching Wood, Limber Wood, Dum Dum Workable Wood, Wood Paste, Wood Plaster, Tilette Canned Wood, Tremo Plastic Wood, Fixit Mending Wood, Magic Wood—all names suggesting the character of the appeal which the product makes to the public as a handy preparation for small repairs. The defendant's product is marketed as Wood Dough.

The defendant has put in evidence 85 patents and several excerpts from textbooks and publications. Perhaps it is not true that many of the patents are merely paper patents, but in other respects what was said by the Circuit Court of Appeals in Naylor v. Alsop Process Company, 168 F. 911, 917, might be repeated here. In that case the court said:

"Defendants have ransacked patent offices in America and Europe, and brought together a formidable collection of patents. Many of them are paper pat-

ents, and others relate to remote arts. Piecing together excerpts and elements from this wide search, they have built up a formidable speculative argument to show how simple and easy was the step taken by Andrews. This is a form of argumentation familiar in patent litigation. Though it seldom succeeds, it is often the only recourse of the infringer. The patent law, however, has its proper place in the realm of actual industrial life, and not in the limboes of parchment casuistry. The merit of a patent is to be determined, not by its standing in dialectics, but by its actual effects in the art to which it belongs. Judged by that test, the Andrews invention was revolutionary. Within five years after its discovery it had been generally applied in the milling business, both in this country and abroad. It accomplished a new and desired industrial result simply, cheaply, and efficiently. In the presence of such an experience, speculative arguments based on the prior art can seldom prevail."

It is unnecessary to single out any one of these 85 patents for particular comment. It is enough to say that they show that inventors, at least since 1855, have been experimenting with the properties of nitrocellulose. Aside from the manufacture of celluloid, which is one of its most conspicuous uses, it has been employed, and patents have been taken out for its use, as a coating for fabrics and as a lacquer. It has been mixed with various types of filler —animal, vegetable and mineral—and the mixtures have been moulded into a great variety of useful articles. Castor oil and resins have been a part of the mixtures. In one or two instances at least, inventors have mixed nitrocellulose with sawdust to make artificial wood.

The significant thing that emerges from an examination of the prior art and the evidence of widespread knowledge of the properties of nitrocellulose which it affords, is that nobody thought of making it available in the workshop and in the home in the form of a convenient putty for repairs to articles made of wood. The deposition of Carleton Ellis is interesting as an illustration of this. Ellis, who testified that he had been engaged for many years in research in the field of resins and plastics and had taken out perhaps a thousand patents relating to subjects in that field, including nitrocellulose compositions, said that it had been many times a matter of regret to him that Griffiths' idea of a putty-like material which would harden to resemble wood had never occurred to him. The same thing is brought out in another way by the testimony of the former manager of the plaintiff's factory, who told how difficult it was at first to introduce their product to dealers because of their skeptical attitude towards a thing so unheard of.

Lapse of time, during which all the principles upon which an invention depends have been widely known, and its beneficial result when at last it comes, have often been held decisive of the question of invention. Thus the Supreme Court, in Webster Loom Company v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177, says:

"It is further argued, however, that, supposing the devices to be sufficiently described, they do not show any invention; and that the combination set forth in the fifth claim is a mere aggregation of old devices, already well known; and therefore it is not patentable. This argument would be sound if the combination claimed by Webster was an obvious one for attaining the advantages proposed,— one which would occur to any mechanic skilled in the art. But it is plain from the evidence, and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skilful persons. It may have been under their very eyes, they may almost be said to have stumbled over it; but they certainly failed to see it, to estimate its value, and to bring it into notice. Who was the first to see it, to understand its value, to give it shape and form, to bring it into notice and urge its adoption, is a question to which we shall shortly give our attention. At this point we are constrained to say that we cannot yield our assent to the argument, that the combination of the different parts or elements for attaining the object in view was so obvious as to merit no title to invention. Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention."

Two recent cases illustrate the application of this principle in arts analagous to that of the patent in suit.

In Yablick v. Protecto Safety Appliance Corporation (C.C.A.) 21 F.(2d) 885, 886, the court had before it a patent for a gas mask. It was shown that the property of the chemical upon which the success of the mask depended, the fact that it would absorb the noxious gas against which the mask was designed to give protection, had been pointed out in a work on chemistry. But the court said: "This fact was not translated into commercial utility until the genius of the patentees did it."

In Donner v. Sheer Pharmacal Corporation (C.C.A.) 64 F.(2d) 217, the patent was for a depilatory. The patentee had taken well-known depilatating agents and combined them with colloid-like substances, also well known, to produce a depilatory which could be applied in the form of a cream. The cream form was much more satisfactory to the public than anything that had been on the market previously, and on this ground the patent was sustained.

Black & Decker Manufacturing Company v. Baltimore Truck Tire Service Corporation (C.C.A.) 40 F.(2d) 910, is an illustration in a different art.

■ Besides its reliance upon the prior art, the defendant urges that there was no invention in what Griffiths did, because, as the testimony shows, his combination was developed in response to an inquiry for a suitable filler for shoe lasts, and the discovery was made in the ordinary course of laboratory experiment. There is nothing in this to make it any the less an invention. The patent laws do not insist upon anything dramatic in the discoveries which they protect. An invention may be patentable, although it is "the result of experiment and not the instant and perfect product of inventive power. A patentee may be baldly empirical, seeing nothing beyond his experiments and the result; yet if he has added a new and valuable article to the world's utilities, he is entitled to the rank and protection of an inventor." Diamond Rubber Company v. Consolidated Rubber Tire Company, 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527.

■■ Another contention upon the issue of invalidity is that the claims of the patent are broader than the specification. The basis of this is the use in the claims of the words "doughy, putty-like" to describe the plastic composition covered by the claims, and the phrase "to harden upon mere exposure to air to substantially the rigidity and solidity of wood." It is true that the specification does not describe the product as doughy and putty-like, but this is only another way of describing it, as the specification does, as plastic. It is also true that the specification does not point out that the mixture hardens to the rigidity and solidity of wood, but it does say that it is to be used for filling, and for molding, and that it hardens quickly when exposed to the air. The patentee is not bound to use in his claims the precise phraseology with which he sets forth the invention in his specification. Indeed, claims may be changed, as a result of proceedings in the Patent Office, to express more adequately the true nature of the invention. Cleveland Foundry Company v. Detroit Vapor Stove Company (C.C.A.) 131 F. 853.

■ The defendant also argues from the evidence of public use of the Griffiths product in England, without any application for a patent there, that Griffiths should be held to have abandoned his invention. But this is plainly insufficient to show abandonment of the right to patent the invention in the United States. See Gandy v. Main Belting Company, 143 U.S. 587, 12 S.Ct. 598, 36 L.Ed. 272. Abandonment is a matter of intent to be clearly proved, and an application for a patent is in itself persuasive proof that the applicant has no intention to dedicate his invention to the public. Ide v. Trorlicht, Duncker & Renard Carpet Company (C.C.A.) 115 F. 137, 144.

Defendant's counsel do not argue in their brief that the defendant's product does not infringe the patent. The only testimony upon the point is the analysis of that product by the plaintiff's chemist, which shows that the ingredients are the same as those of the patent, except for the substitution of toluol for benzol as a solvent, and that they are combined in substantially the same proportions as those of the plaintiff's commercial product, which also makes the same substitution of toluol for benzol.

■ I conclude that the claims in suit are valid and infringed.

Let there be a decree against the defendant Harris-Thomas Company for an injunction and an accounting, with costs.

As to the defendant Low Supply Company, the bill is dismissed, and it should recover its costs.