## MATHEY v. UNITED SHOE MACHINERY CORPORATION.

### No. 4448.

District Court, D. Massachusetts.
April 23, 1940.

Richard F. Walker and Roberts, Cushman & Woodberry, all of Boston, Mass., for plaintiff.

H. F. Lyman, H. L. Kirkpatrick, and Fish, Richardson & Neave, all of Boston, Mass., for defendant.

FORD, District Judge.

This is a suit for infringement of claims 2, 4, 16, and 40 of patent No. 1,807,996 for an improvement in a trimming machine issued to and owned by the plaintiff. The application was filed May 27, 1929 and the patent issued June 2, 1931. The defenses now relied upon by the defendant are (1) invalidity and (2) non-infringement. The defense of laches was waived.

Findings of Fact

The nature of the invention is described in the specification as follows:

"This invention pertains to the manufacture of footwear and relates more particularly to apparatus for trimming the breast covering flaps of wood heels. In making shoes with wood heels it is usual to skive up a thin flap from the rear portion of the outer sole and after the heel has been secured in position, this flap is cemented to the breast surface of the heel, thus forming a smooth finish for the latter. Since the contour of the heel seat portion of the outer sole is not like that of the breast surface of the heel, it is necessary, after the flap is attached to the heel, to trim off the surplus material of the marginal portions of the flap.

\* \* \* \* \*

"Moreover, while the present invention is primarily designed to facilitate the trimming of heel covering flaps, the combinations and sub-combinations of mechanical parts herein illustrated by way of example are well adapted to trim surplus material from any part of a shoe; for example, a rand, welt or lining, and I contemplate that all possible uses of the invention herein set forth fall within the purview of the appended claims."

The claims in suit are as follows:

"2. Apparatus of the class described comprising a reciprocating cutter adapted to remove surplus material from the breast covering flap of a shoe heel, and means for reciprocating the cutter in the direction of the intended cut."

"4. Apparatus of the class described comprising a rest for engagement with the breast surface of a shoe heel, an oscil-

lating cutter having its cutting edge disposed in a plane intersecting the plane of the breast surface of a heel engaging the rest, and means for oscillating the cutter in the direction of the intended cut."

"16. Apparatus for trimming off surplus material from the breast covering flap of a shoe heel comprising an oscillating blade carrier, a blade mounted on the carrier, said blade having a substantially V-shaped recess extending in the direction of movement of the blade, one side of said recess constituting the cutting edge, and a work rest engageable with the breast surface of the shoe heel to determine the line of cut."

"40. Apparatus for trimming off surplus material from the breast covering flap of a shoe heel comprising a work rest having a surface for engagement with the breast surface of a shoe heel and having an edge constituting a stationary blade, an oscillating cutter having its cutting edge disposed in a plane intersecting the plane of the breast surface of a heel engaging the rest, said cutter oscillating over one surface of the rest and . in close proximity thereto with its cutting edge intersecting the plane of the edge of the stationary blade, and means for oscillating the cutter, the path of movement of the cutter having a substantial component in the direction of the intended cut."

The evidence showed that heel flap trimming generally had been done in shoe factories for many years and reached its peak somewhere between 1918 to 1920. Since this time about 90% of women's shoes manufactured have wooden heel flap trimming. Leather heels on women's shoes are little used in the trade. Prior to the time the trimming machine of Mathey made its appearance, heel flap trimming was done by hand with a small flat hand operated knife. This demanded some skill on the part of the operator and was fairly expensive. The plaintiff had been working for some time to perfect a machine for the trimming of heel flaps and in October, 1929, he put the machine of the patent in suit on the market commercially. It was the first machine mechanized for this purpose in the United States and was called the Hamlin Economy Wood Heel Flap Trimmer, Model B. The machines were shipped to the trade on lease after trial by the lessee, and a charge was made for installation and rental.

The defendant's alleged infringing machine has been on the market continuously since the winter of 1930-1931. This machine was substantially one upon which a patent was issued to one Boulton (1,963,-071). The rights to this patent have been assigned to the defendant. The patent application was prepared by the patent department of the defendant company after assignment. Two models embracing the features of the Boulton device put out by the defendant were known as Boothco Trimming Machine, Models D and G. It was agreed, for the trial of the issues in this case, there were no substantial differences between these models. The evidence showed that Boulton had seen and examined a machine of the plaintiff which had been leased to a manufacturer before he (Boulton) brought out the machine covered by this patent. Boulton was a resident of Rochester and it was there the plaintiff's machine, seen by him, was located. The defendant's machines are manufactured in Rochester, New York. The plaintiff's machine though at once commercially successful and adopted by the trade, saving effort and effectively reducing expense, was unable to meet the competition from the defendant's machine, which was offered at lower rates. As a result, the plaintiff has not offered his machine to the manufacturers for the past eight or nine years. The evidence showed that there are about 500 women's shoe manufacturers in the United States and 100 of these use the defendant's machines at the present time. About twelve manufacturers had been using the plaintiff's machine up to a short time before the suit and at that time several of these were returned, the leases having expired. It appeared from the evidence that only a large factory used this type of machine.

The main features of the plaintiff's machine are a rotating shaft which, by means of an eccentric, oscillates to the right and left the upper end of a driver bar. To the driver bar is pivotally attached a blade carrier and to the latter a cutter, blade, or knife is attached as an integral part of it in such a way as to form a V-shaped recess between the blade and the carrier extending in the direction of the movement of the blade. The movement of the knife is not mathematically or exactly in the direction of the cut as it swings in a slightly curved path or arc. It swings exactly in the direction of the cut at only one theoreti-

cal point in the arc. However, the cutting movement of the knife is directed by the mechanism into the work substantially and for all practical purposes in the direction of the intended cut; in this case, along the edge of the Louis heels. The cutting is effected solely on the forward stroke of the knife, the forward travel on each stroke being about one-eighth of an inch and the machine being driven approximately 4,000 strokes per minute (66-plus strokes per second). As the patentee says in this patent, "the arrangement * * * is such that the cutter moves back and forth in the direction of the intended cut and not traversely through the material." The work rest, conically shaped, is mounted in the machine below and to one side of the knife. The blade moves in close proximity to the upper surface of the work rest, the purpose of the latter being to support the breast surface of the heel while the cutter is coming forward and the edge of it supports the work.

### Opinion

The defendant argues that there was no invention in the claims involved in Mathey's patent and relies upon Barber, 156,267, October 27, 1874; Barber, 177,778, May 23, 1876; Diehl et al., 619,873, February 21, 1899; Wales, 959,275, May 24, 1910; and Peck 1,300,642, April 15, 1919. These patents were not cited in the patent office against the plaintiff's application. These patents illustrate the so-called Barber Undertrimmer on sewing machines. It was agreed that the so-called Barber Undertrimmer of the general type illustrated in these patents had been in public use for some years prior to the date of the plaintiff's invention. This mechanism is embodied in machines made and sold by Singer Sewing Machine Company of Newark, New Jersey, two of which were introduced in evidence in this case. The device in the Singer machine is employed in sewing a seam around the top edge of the uppers of shoes and at the same time trimming off the surplus material beyond the line of stitching. The problem that the patent in suit was directed to was to provide apparatus for "trimming the breast covering of wood heels", known, as the evidence showed, as Louis heels. These heels were trimmed when attached to the shoes. The Singer machines were not adapted to do this work nor were they designed or used for it. It was demonstrated in court that the Singer machines could properly trim detached Cuban heels but this was not the problem the trade was trying to solve. The device in suit was adapted for trimming Louis heels attached to the shoe. It was this kind of heel that was generally in use and the patent in suit was directed to the problem of trimming this type of heel, which the machines of the prior art sought so long unsuccessfully to do.

The patents showing the Barber Undertrimmer were directed at lining trimmers and the patent in Kirton, cited by the defendant (British 175,511), displayed a rough heel trimming device. It was admitted by all the experts for the defendant that there would have to be re-adaptation of the Singer machines to permit them to trim Louis heels.

The Court said in Topliff v. Topliff, 145 U.S. 156, 162, 12 S.Ct. 825, 828, 36 L.Ed. 658, "It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor actually used, for the performance of such functions." So in this case, the fact that the Barber Undertrimmer might have, by modification, been adapted to trim Louis heels, does not destroy the patentability of Mathey's device. Patent & Licensing Corp. v. Weaver-Wall Co., 6 Cir., 95 F. 2d 182, 184.

The plaintiff's device involved an improvement in the art and filled a long felt want. It dispensed with a hand operation in a manner of its own. Mathey alone possessed the creative faculty to require the cutter, in trimming Louis heels, to move in the direction of the intended cut, which fact, together with an arrangement of the knife and the rest to allow a finished shoe with a Louis heel to be fed to it for trimming, solved the problem of trimming Louis heels with a clean cut. Other inventors were challenged for a great many years by the problem and failed. The use made of the plaintiff's device was not so analogous to that displayed in the Singer machine, which solved an entirely different problem, that the applicability of the Barber Undertrimmer would occur to a person of ordinary mechanical skill. The Barber Undertrimmer was in existence for a great many years but it did not help the defendant and others to solve the problem presented here. See Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 68, 43

S.Ct. 322, 67 L.Ed. 523; Webster Loom Co. v. Higgins et al., 105 U.S. 580, 26 L.Ed. 1177; Dean Rubber Mfg. Co. et al. v. Killian, 8 Cir., 106 F.2d 316, 319; Forestek Plating & Mfg. Co. v. Knapp-Monarch Co., 6 Cir., 106 F.2d 554, 557; Yablick v. Protecto Safety Appliance Corp., 3 Cir., 21 F.2d 885, 886; A. S. Boyle Co. v. Harris-Thomas Co. et al., D.C., 18 F.Supp. 177, 180.

The question of invention is generally a question of fact and I find that the plaintiff's machine involves inventive skill. The patents showing the so-called Barber Undertrimmer did not anticipate Mathey, nor did Kirton, supra. Spalsbury (1,578,293) and Adams (British, 271,588) did not anticipate, as the devices there, substantially the same in both, involve a cutter which moves transversely across the work and line of cut with the cutting occurring in a stroke moving away from the heel, and these were unsatisfactory in that they caused ragged edges. The case of United Shoe Machinery Co. v. Mathey, D.C., 43 F.2d 617, cited by the defendant, is not applicable, as there both machines were directed at the same problem, i. e., edge trimming of flat uppers. I find claims 2, 4, and 16 of the patent in suit are valid.

In respect of claim 40 of the patent in suit, it is the contention of the defendant that this claim is invalid because it does not read upon the Mathey machine. The defendant contends the "stationary blade", which the claim requires, is not present in the Mathey machine; that there is present merely a workrest which takes no part in the cutting. Also, the claim requires that the cutting edge of the cutter shall intersect "the plane of the edge of the stationary blade". It was perfectly obvious from the evidence adduced at the trial that neither of these disclosures were present in the Mathey machine. The specification does not support this claim. This claim is invalid. Stelos Co. v. Hosiery Motor-Mend Corp. et al., 295 U.S. 237, 241, 243, 55 S.Ct. 746, 79 L.Ed. 1414; Brand v. Thomas, Cust. & Pat.App., 96 F.2d 301, 304. The evidence also showed that this claim was drawn by the plaintiff's expert in an attempt to draw a claim which would read more directly on the defendant's machine than the other claims in suit and at the same time read upon the plaintiff's machine. The Court said in Chicago & N. W. R. Co. v. Sayles, 97 U.S. 554, 563, 24 L.Ed. 1053, "Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted * * *."

This brings us to the question of whether the defendant's device infringes claims 2, 4, and 16 of the patent in suit.

The cutting parts of the defendant's machine are the more material parts to be considered in connection with this issue. The defendant's device possesses a hook-shaped cutter cooperating in part with a stationary blade. The cutter moves continuously in an orbital circular path for the most part transverse to the line of cut of the material. The diameter of the orbit is about one thirty-second of an inch. The knife moves in the beginning of its stroke for a substantial part of its orbit transverse to the line of cut and away from the stationary blade. No shearing is done by the knife during this transverse movement away from the rest. The remainder of the stroke or orbit of the knife is transverse to the line of cut in the direction of the stationary blade and here a shearing cut is produced by the knife in cooperation with the stationary blade. The cutting part of the knife then returns to get in position for its forward cutting stroke at the beginning of the orbit and no cutting is done by the knife as it moves rearward to take this position. The rearword movement of the knife is functionally immaterial to the operation of the cut.

Trimming machines having a cutter moving back and forth with a transverse movement across the line of cut of the material are not new in the art. This is best illustrated in Spalsbury (1,578,293, January 9, 1924), owned by the defendant since 1926, and Adams (British 271,588, June 2, 1927), both of which have been referred to above. When the claims in suit were first presented by the plaintiff to the patent office these patents were cited against the application. Claim 2 in suit originally read, "Apparatus of the class described comprising a reciprocating cutter adapted to remove surplus material from the breast covering flap of a shoe heel, and means for actuating the cutter." Mathey amended this claim in view of the Spalsbury citation, so that it now reads, " * * * means for reciprocating the cutter in the direction of the intended cut." This limitation got him away from Spalsbury as the latter had a reciprocating cutter with a transverse movement, that is, transverse to the line of cut of the material.

The words "in the direction of the intended cut" at the end of claim 4, as it now stands, were added after the Spalsbury citation, as were the words, "extending in the direction of movement of the blade" in claim 16 after the words "V-shaped recess." Mathey further stated in his specification, "It is to be noted that the arrangement above described is such that the cutter moves back and forth in the direction of the intended cut and not transversely through the material." It is obvious from this that the patentee drew his claims to describe a device with means for reciprocating the cutter substantially in the direction of the intended cut. But the plaintiff did not confine claims 2 and 4 of the patent to a device which was limited to a longitudinal cutting throughout the entire stroke. The language of the claims was broader than this. In the light of the art in Spalsbury and Adams, where is reflected an entire and exact transverse cutting for the whole stroke, there was available for the plaintiff a stroke substantially, but not exactly, longitudinal. Neither the language of the claims nor the specification excludes a device which, though substantially longitudinal, has some transverse movement, as the defendant's device possesses. The contention of the plaintiff is that his advance over the prior art which discloses rotary or disc cutters (Cocozella, 1,747,577; Ricks, 1,708,401) and cutters reciprocating transversely across the work and line of cut (Spalsbury, supra), all of which were unsuccessful because they pulled the material and did not afford a clean cut, consisted in constructing a device possessing means for moving the cutter during its cutting stroke into the work in the direction of the line of cut. It was this forward cut, as distinguished from a transverse cut, that solved the problem presented. This latter feature was the dominant factor that made the plaintiff's device patentable over the disclosed art. Without this feature, in view of the experience of Spalsbury and others, success would not have been attained by the patentee.

■■ The defendant argues that its machine was a development of the Spalsbury patent; that the orbital motion of the cutter was not a reciprocating motion nor an oscillating motion within the terms of the plaintiff's patent. It maintains that in its machine there is a shearing action and this feature is not present in Mathey. The defendant contends that its machine has a substantially different mode of operation. Of course, it is quite plain that the defendant had to add other features to its machine than those that appeared in Spalsbury to make it successful. Cutting transversely to the line of feed of the material was not enough in Spalsbury; it would not be enough in its. What made the defendant's machine successful was incorporating in its device the dominating feature of the plaintiff's machine, i. e., the knife moving in the direction of the cut. There is no shearing action at the beginning of the stroke of the defendant's cutter; there is a forward chop into the work as there is in Mathey's machine. This part of the cutting stroke is done by the knife edge itself and for a considerable distance of the stroke. It is transverse away from the so-called stationary blade with no shearing, and at the same time it is longitudinal, and, inasmuch as the prior art indicated that a transverse movement would pull the material, it is a logical conclusion that the movement in the direction of the cut, the longitudinal motion, is the all-important component. This is the important feature of the plaintiff's device. The movement of the defendant's knife into the work in its transverse and longitudinal direction and its return to the starting point is substantially a backward and forward or reciprocating movement of the cutter in the direction of the intended cut. "Oscillating" the cutter in the direction of the intended cut, which is the language used in claim 4, conveys, for all practical purposes, the same idea as reciprocating. The plain meaning of both words is "back and forth". I can see no substantial difference as far as the mode of operation is concerned in the movement of the separate cutters between the stop, start, and stop movement of the knife in the plaintiff's machine and that of the defendant's, except that the latter part of the cutting in the defendant's machine is a shearing action. In its early advertising the defendant described its knife movement as an "oscillating" one. This is an important admission. The principle of the plaintiff's machine has been ingeniously adopted by the defendant. Where, as here, defendant has copied the basic idea of the plaintiff's device in providing means for moving the cutter in the direction of the intended cut, the addition of a cross shear movement in the latter part of the stroke of the defendant's cutter does not enable the defendant to avoid infringement.

The claims are broad enough to include this latter feature for the reasons stated above. See Walker on Patents, Deller's Ed., Sec. 460, p. 1693. Nor can the defendant argue that its machine is an improvement over the plaintiff's and avoid infringement. If the basic idea of the patentee is appropriated by another, the latter is an infringer even though an improver. Temco Electric Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 328, 48 S.Ct. 170, 72 L.Ed. 298.

The "oscillating blade carrier" and "a blade mounted on the carrier, * * * having a substantially V-shaped recess extending in the direction of movement of the blade," features that appear in claim 16, are substantially found in the defendant's device. The arrangement of the knife and the rest of the Mathey machine are substantially present in the defendant's machine.

 Further, if we resort to the doctrine of equivalents, the defendant cannot successfully contend, to avoid infringement, that its machine does not respond to the precise mode of operation described in the terms of the Mathey patent. A claim which expressly covers a particular device, impliedly covers any equivalent of that device. As was said in the case of Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 418, 28 S. Ct. 748, 751, 52 L.Ed. 1122, "An inventor must describe what he conceives to be the best mode, but he is not confined to that. If this were not so most patents would be of little worth." Chicago Pneumatic Tool Co. v. Hughes Tool Co., 10 Cir., 97 F.2d 945; Morley Sewing Machine Co. et al. v. Lancaster, 129 U.S. 263, 9 S.Ct. 299, 32 L.Ed. 715.

 Mathey was the first to accomplish the operation shown in his patent and he is entitled to a range of equivalents commensurate with the scope of his invention. Continental Paper Bag Co. v. Eastern Paper Bag Co., supra. The tests of equivalency are (a) identity of function, which is present here, and (b) substantial identity of the way of performing that function. I cannot escape the conviction that the accused machine operates substantially in the same manner as does the Mathey machine. I have stated that I thought the mode of operation in the defendant's machine was directly within claims 2, 4, and 16. Certainly, when the doctrine of equivalents is applied, the device of the defendant responds to the terms of claims 2, 4, and 16 of the Mathey patent and infringes them.

### Conclusions

Claims 2, 4, and 16 are valid and infringed. Claim 40 is invalid for reasons above-stated.

A decree may be entered against the defendant for an injunction and an accounting, with costs.