AEROTEC INDUSTRIES OF CALIF. et al., Appellant,

v.

PACIFIC SCIENTIFIC COMPANY, Appellee.

No. 20510.

United States Court of Appeals Ninth Circuit.

July 26, 1967.

Rehearing Denied Aug. 31, 1967.

---

William Poms, Miketta, Glenny, Poms & Smith, Los Angeles, Cal., E. Seward Stevens, Litchfield, Conn., for appellant.

C. Russell Hale, D. Bruce Prout, Christie, Parker & Hale, Pasadena, Cal., for appellee.

Before BARNES, JERTBERG, and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

This is an appeal from a judgment holding certain claims of appellee's patents valid and infringed. The patents are Pfankuch, No. 2,845,233, claims 7

and 9,[1] and Cushman, No. 2,845,234, claims 1 and 5.[2] We reverse.

Appellants' device is described in the Spielman patent, No. 2,982,492. Pfankuch was issued July 29, 1958, Cushman on the same day, Spielman on May 2, 1961. Strange to say, neither Pfankuch nor Cushman nor any of the prior art cited in either of them is cited as prior art in Spielman.

1. The two Pfankuch claims read: "7. Safety apparatus for preventing a seat occupant of a vehicle from being thrown off his seat, comprising an inertia lock device adapted to be mounted on the back of the seat, said device having a rotatably mounted reel therewithin, a flexible connector wound on said reel and extending outwardly of said device for passing over the body of the seat occupant, a yieldable resilient member coupled to said reel and tensioned so as to urge rotation of said reel in the direction to wind up the connector thereon to thereby normally maintain a light tension on said flexible connector while allowing the same to yield, whereby the seat occupant is permitted freedom of motion, an inertia member turnably movable with respect to said reel, means for connecting said inertia member with said reel, locking means within said device for locking said inertia member and reel against turning movement, movement of said flexible connector outwardly of said device at a rate exceeding a predetermined acceleration, due to a sudden force tending to dislodge the seat occupant, causing said inertia member to resist the turning of said reel and effect the locking of the reel and inertia member by said locking means, thus positively preventing further outward movement of the flexible connector to retain the seat occupant in his seat. * * *

"9. Safety apparatus adapted to be used on a moving vehicle, comprising, in combination, a supporting housing on said vehicle, a flexible connector extending from said supporting housing and adopted to engage an occupant in the vehicle, resilient reel means connected to said flexible member and carried within said housing for normally maintaining a light tension on said flexible connector while permitting the same to yield, whereby the occupant is allowed freedom of motion, an inertia member within said housing turnably mounted with respect to said reel means, means for coupling said inertia member to said reel means, locking means in said housing, said inertia member being operable by inertia to cause said locking means to lock said flexible connector positively against further movement outwardly with respect to said housing when said flexible connector is pulled outwardly of said housing at a rate exceeding predetermined acceleration, due to forces tending to dislodge the occupant from his seat, whereby the occupant is prevented from being dislodged."

2. The two Cushman claims read: "1. A safety device for mounting in a vehicle to restrain the movement of a body within the vehicle when the body is subjected to relatively high acceleration movement relative to the vehicle comprising a cable adapted to be coupled to the body, a cable reel rotatably mounted in said device, resilient means coupled to said reel for rotating said reel in one direction to wind up said cable, said reel rotating in the other direction to unwind the cable responsive to forces exerted by a pull on the cable, an inertia member rotatably mounted in said device, said inertia member rotating in unison with said reel during rotation thereof in the unwind direction below a predetermined acceleration, said reel rotating relative to said inertia member during rotation of said reel at the predetermined acceleration due to an abnormal acceleration of the cable, and means operated in response to the relative rotation of said reel in the unwind direction to thereby restrain movement of the body in the vehicle. * * *

* * * * *

"5. A safety device for mounting in a vehicle to restrain the movement of a body within the vehicle when the body is subjected to relatively high acceleration movement relative to the vehicle comprising a cable adapted to be coupled to the body, a rotatably mounted cable reel having said cable secured thereon, resilient means coupled to said reel for rotating said cable reel in a direction to wind said cable on said reel, said reel rotating in the opposite direction to unwind said cable therefrom due to forces exerted by a pull on the cable, a rotatably mounted inertia member, means for yieldably coupling said inertia member to said reel to thereby cause said member to rotate with said reel during rotation in said unwind direction below a certain acceleration, said means yielding during rotation at said certain acceleration to cause said reel to rotate relative to said inertia member, and means associated with said coupling means operated when said reel rotates relative to said inertia member for stopping rotation of the reel in said unwind direction."

All three devices have the same stated objective, described in somewhat different ways in the introductory paragraphs in each patent. Typical is the following, from Pfankuch:

"This invention relates, generally, to novel safety apparatus for use by pilots, operators, and other crew members, such as bombardiers, navigators, gunners, etc. of rapidly moving vehicles such as aircraft and automobiles, and more particularly, to novel inertia-operated apparatus for use with body harnesses which apparatus automatically functions to safely retain the pilots in their seats during crashes and the like.

"Safety apparatus of this type have been developed over the years and comprise devices for use in conjunction with a shoulder harness which permit movement of the shoulder harness and consequently movement of the upper portion of the pilot's body during normal motions of his craft but which automatically operate to restrict movement of the shoulder harness and pilot during abnormal or violent motions of the craft. These devices have taken the form of reels or drums with a cable wound thereon, the cable being secured to the shoulder harness. The cable is reeled off the drum in response to tension on the shoulder harness and rewound on the drum when the tension is removed. During abnormal motions of the craft, the device automatically operates to lock up the reel and prevent the cable from reeling out, thus restricting the movement of the shoulder harness."

The opening paragraphs of Spielman are strikingly similar.

Each device is designed to be attached to the seat of the vehicle, and to be connected to the shoulder harness of the seat occupant. In each, the attachment is by a cord or a strap, wound on a reel housed in the device. In each, the reel is spring wound, so that when the cord or strap is pulled out, the spring is tightened and when the tension on the cord or strap is released the spring causes it to be rewound on the reel. In each the reel is so designed that, when there is a sudden deceleration of the vehicle, the reel will lock, thus preventing further movement of the seat occupant away from his seat. As is disclosed in the Pfankuch patent, quoted above, devices that are designed to accomplish these results were not new when appellee's patents were issued. Patents covering just such devices are in the record and were cited as prior art in Pfankuch and Cushman. These are Geohegan, No. 2,403,653, Nordmark, Nos. 2,434,119 and 2,701,693 and Heinemann, No. 2,708,555.

The "new and useful" elements, necessary to patentability (35 U.S.C. § 101), must lie elsewhere than in the foregoing combination of elements. They lie, according to appellee, in the manner in which its devices lock the reel. Each of the four prior patents mentioned above uses the force of inertia to accomplish the desired result. When the vehicle decelerates, the inertia of certain movable parts of the device causes them to move relative to other, fixed, parts, and thus to lock the reel. In its finding, the trial court described these devices as "vehicle-sensitive."

In the devices here in suit, the forces of inertia are also used, but in a different way. When a fast moving vehicle, such as an airplane, crashes or makes some sudden movement, such as hitting a downdraft, the inertia of bodies that are within it but not fastened to it will cause them to continue in the original direction of movement. Thus, in case of a crash, passengers move violently forward; in case of a drop, they may strike the roof, in case of a sudden movement sidewise, they may hit a wall or fall into the aisle. In such cases it is more accurate to say that the vehicle strikes the passenger than that the passenger strikes the vehicle. The same force would produce the same result if a dummy or a parcel were placed in a seat, and in any fast moving vehicle, such as an automobile. It is the inertial force of such a body, pulling on the cord or strap wound on the reel, that

is used to activate the locking device in the reel, in the case of each of the devices in suit. And, it is the inertial resistance of certain movable parts, connected with the reel, to sudden acceleration that causes the locking.

The trial court used the phrase "man-sensitive" to describe these devices. This anthropomorphic phrase does not add to the clarity of thought. The reels do not "sense" the movements of a man. They merely respond to physical forces when the latter are applied to the cord or strap wound on them by whatever body, animate or inanimate, may be attached to it. If it be understood that this is all that the phrase means, it can do no harm. Indeed, in the Pfankuch patent, it is stated "this novel invention may be used in connection with objects other than human beings, such as, for example, freight handling and the like." But the phrase was used by appellee's counsel and the trial court accepted it; we think that it helped to lead the court astray.

In the Pfankuch device, the reel is mounted in vertical slots so that the whole reel can move upward. By a system of gears, a flywheel or inertia member, running freely on the same spindle as the reel, is made to turn when the reel turns, the gear ratio being such that, as the patent states, "preferably for every four revolutions of the flywheel, the cable drum [reel] makes one revolution." Mounted in the side of the reel is a circular member having ratchet teeth on its circumference. When the reel is in its normal position, its axle rests in the bottoms of the slots, the reel being held in that position by its own weight and by the tension of the winding spring, which is adjustable in this respect. Mounted above the reel is a spring-controlled pawl, or dog. When the cable on the reel is pulled out slowly and gently, as by ordinary movements of the seat occupant's body, the reel unwinds without rising in the slots. When there is a sudden heavy pull on the reel, causing it to accelerate very rapidly, the inertia of the flywheel resists the acceleration, with the result that the reel is lifted in the slots and the ratchet teeth engage the dog and lock the reel, thus preventing payout of the cable.

The Cushman patent shows a similar device, but one that is somewhat more sophisticated. The reel is mounted and held in a fixed position. Mounted with it is a flywheel which can move about five degrees in relation to the reel, at which point it must engage and rotate with the reel. When there is a sudden acceleration, the inertia of the flywheel moves it through this angle relative to the reel and causes a mechanism to operate which releases a spring mounted pawl that then engages the teeth mounted on the flywheel and locks the reel, as occurs in the Pfankuch type of reel. Cushman was issued as an improvement patent on Pfankuch.[3]

The appellants' device produces the same basic result as do the Pfankuch and

3. We quote the following rather Rube Goldbergian description of what happens:
"When the sharp jerk occurs on the cable 7, it tends to rotate the cable reel 19 at a rapid rate of acceleration. The drive link 22 tends to rotate the ratchet wheel 32 along with the cable reel but this ratchet wheel is made of a relatively heavy metal mass, and it tends to remain stationary when the force is first applied. This tendency of the ratchet wheel to remain stationary overcomes the spring-loading force on the tripping-lever system. There is, therefore, a relative rotational movement between the cable reel 19 and the ratchet wheel 32 and this causes the drive link 22 to pivot or turn in a clockwise direction as viewed in Fig. 2. The inner end of the drive link 22, in passing through its arc of movement, moves the base leg of the rock shaft 45, causing the rock shaft to rock or cant on its flange 43 and ride up within the shaft 18. It is better shown in Fig. 5. The pin 46 is thus made to move to the right as viewed in Fig. 3, tilting the rocker arm 47. This movement of the rocker arm 47 moves the pin 52 to the left as viewed in Fig. 4, thus rotating sear 53 about its pivot pin 54 against the tension of spring 55. The sear button 53 is thus disengaged from the finger 56 and the pawl 57 rotates under pressure of spring 59 to engage the ratchet teeth and thus locks the ratchet wheel 32."

Cushman devices. The reel is encircled by a ring having ratchet teeth on its interior circumference. Mounted in slots on the end of the reel are two dogs, or pawls, held in place by springs. When so held, their position is such that they do not engage the interior teeth of the surrounding ratchet ring. They are pivoted, however, and can move within the slots. The tension of the springs is such that when the reel is activated by ordinary movements of the seat occupant, the dogs do not move relative to the reel. But when a sudden acceleration of the reel occurs, the inertia of the dogs, or pawls, causes them to move relative to the reel, at which point their tips engage the teeth of the ratchet and lock the reel.

The appellants' principal attack on the judgment is based upon the contentions that the various elements of the Pfankuch and Cushman patent claims are anticipated by prior art and that they fall within the limiting language of 35 U.S.C. § 103.[4] The prior art patents upon which appellants principally rely fall into three categories.

First, there is the Sharpe patent, No. 2,370,921. This discloses the idea of a spring operated reel having ratchet teeth on its circumference which are caused to engage with a pawl when there is a sudden pull or acceleration of the cord wound on the reel. This reel moves downward in slots, being held in its normal position by a spring, the tension of which permits gentle or slow unwinding but is insufficient to resist the inertia of the reel when it is suddenly accelerated. Such sudden acceleration causes the reel to move downward in the slots against the tension of the spring and to engage the equivalent of a pawl, or dog. The purpose of this reel is to prevent a

cow from kicking over the milk bucket when she is being milked, the cord being attached to the cow's leg, and it was cited as prior art in Pfankuch, but not in Cushman. Thus there is nothing new or patentable about a reel which can be moved into its locking position by reason of its inertial resistance to sudden acceleration.

Second, there are the Geohegan, Nordmark and Heinemann patents mentioned, supra. They show that there is nothing new about the idea of using a spring wound lockable reel in connection with the harness holding a person in his seat in a moving vehicle, or in using inertial force to cause the reel to lock.

Third, there are patents on an old and familiar device, the trolley catcher. These patents are Fairchild, No. 657,342 of 1900, Ham, No. 700,763 of 1902, Burdon, No. 888,418 of 1908, Porter, No. 1,122,420 of 1914 and Ricketts, No. 1,393,570 of 1921. None of these was cited in either Pfankuch or Cushman. The trolley catcher device is one that used to be familiar to most Americans and can still be seen in operation in a few of our cities. It consists of a reel on which is wound a cord, the free end of which is attached to a trolley pole. The trolley is held against the overhead wire on which it runs by a heavy spring mounted on top of the vehicle to which it is attached. The trolley catcher maintains a slight tension on the upper end of the trolley pole, pulling against the pressure of the spring that holds the trolley against the wire, by virtue of a rewind mechanism on the reel of the trolley catcher.[5] The height of the trolley wire above the vehicle is not constant, and the distance of the end of the trolley pole from the vehicle thus must vary as the vehicle moves. Variation in this distance also

4. "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

5. In all of the trolley catcher patents except Burdon, the rewind is by a spring; in Burdon, the rewind is by a rope, wound on the reel and activated by a weight.

occurs when the trolley swings to the side as the vehicle turns. The rewind mechanism permits the cord to be pulled off the reel when the distance increases and winds it up when the distance decreases. The trolley may jump off the wire, and when it does, the spring on which it is mounted causes it to fly up. Each device prevents this by causing the reel to lock when this occurs. The locking is a response to the sudden acceleration of the reel. In all of the devices, a dog, or pawl, is caused to engage ratchet teeth. In Fairchild, the teeth are on the reel and the dog is on the housing, as in appellee's devices; in the other four the teeth surround the reel and the dog is on the reel, as in appellants' device. In all except Fairchild, there is a member movably mounted on the reel, which revolves with it in normal use, but the inertia of which causes it to move relative to the reel in response to sudden acceleration, as in all three of the devices in suit. In each such case, the operation of the inertial element causes the dog to engage the teeth and thus to lock the reel. In one version of Ham, as in appellants' device, the dog itself is the part the inertia of which causes the movement into locking position. In the preferred version of Ham, and in Burdon, Porter and Ricketts, there is a separate part, which is movably connected to the reel and supplies the inertia to produce locking in response to acceleration, as in Pfankuch and Cushman. Both of the latter devices embody what is in substance a flywheel. So does Porter.

Let us assume that the Ham device is attached to the rear of an airplane seat and to the occupant's harness just as in the patents in suit. In that case, to use Claim 1 of Pfankuch (supra, n. 1), we would have an inertia lock device mounted on the back of the seat, having a rotatably mounted reel therewithin, a flexible connector wound on said reel and extending outwardly [to the harness which is] for passing over the body of the seat occupant, a yieldable resilient member coupled to said reel and tensioned so as to urge rotation of said reel in the direc-

tion to wind up the connector thereon to thereby normally maintain a light tension on said flexible connector while allowing the same to yield, whereby the seat occupant is permitted freedom of motion, an inertia member turnably movable with respect to said reel, means for connecting said inertia member with said reel, locking means within said device for locking said inertia member and reel against turning movement, movement of said flexible connector outwardly of said reel at a rate exceeding a predetermined acceleration due to a sudden force tending to dislodge the seat occupant, causing said inertia member to resist the turning of said reel and effect the locking of the reel and inertia member by said locking means, thus positively preventing further outward movement of the flexible connector to retain the seat occupant in his seat.

One can go through the same analysis, with the same result, as to each of the other claims of Pfankuch and Cushman that are in suit, as well as with Spielman, and with each of the other trolley catchers. Nevertheless, the trial judge distinguished the trolley catcher patents, on several grounds. None, we think, has merit.

One ground is that the trolley catchers are not as closely related to appellee's inventions as the prior patents considered by the Patent Office, and that the trolley catcher patents lie in a nonanalogous art and are therefore not pertinent prior art. In support of these findings, appellee points to the fact that its devices are primarily designed to hold a man in his seat, while the trolley catcher is designed to stop the upward movement of a trolley pole in the air. As the trial judge put it, the trolley-catching devices are for a markedly different purpose than keeping a man in his seat in the event he is accelerated in any direction with respect to the seat. In this connection, the court said: "The trolley catching devices are not man-sensitive safety devices at all." This last statement is true, but it is, as we have already pointed out, equally true of the

devices in suit. The trial judge also found that the trolley catcher devices were not considered by the inventors of the patent in suit nor by the skilled engineers designing "man-sensitive" apparatus for appellee, appellants or American Seating Company when "man-sensitive" safety apparatus was being developed by these companies.

But surely if patents relating to reels on rope fire escapes (Scheuer, No. 1,037,-333, 1912; Caouette, 1,308,480, 1919); fishing reels, (Foss, No. 1,744,461, 1923; Rutledge, No. 2,324,324, 1941) are pertinent art, having been so cited in Pfankuch or Cushman or both, presumably because they involve reels that can be locked or controlled by acceleration activated inertia members, the trolley catchers are equally pertinent. And for the life of us we cannot see why the Sharpe patent, which is designed to keep a cow from kicking over the milk pail, is valid prior art if the trolley catchers are not. Like it, they embody the same basic concept—a spring-wound reel which can be caused to lock up when it is suddenly accelerated, the locking mechanism being operated by the inertia of a member built into the reel for that purpose (in Sharpe, the reel itself).

■■ Appellee cites and relies upon our decision in Stearns v. Tinker and Rasor, 9 Cir., 1955, 220 F.2d 49 at 56–57. But we think that the test there laid down, when applied here, supports the appellants' position rather than that of appellee. We there said:

"The rule laid down by many of the authorities is that whether arts or uses are analogous depends upon the similarity of their elements and purposes. It is said that if the elements and purposes in one art are related and similar to those in another art, and because and by reason of that relation and similarity make an appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then such arts must be said to be analogous; and, if the converse is true, they are non-analogous arts."

As we have pointed out, the elements of the trolley catcher patents are strikingly similar to those of the appellee's patents. So are their purposes: to provide, in a spring rewound reel, free movement of the cord from the reel under a normal load, plus locking under unusual acceleration. See Hall v. Wright, 9 Cir., 1957, 240 F.2d 787, 792; Brown v. Piper, 1875, 91 U.S. (1 Otto) 37, 23 L.Ed. 200; Page v. United States Divers Co., D.C.S.D.Cal.1964, 235 F. Supp. 554, aff'd 9 Cir., 1966, 361 F.2d 478.

■ We cannot believe that, if appellee's skilled engineers, knowing nothing at all about trolley catchers or the trolley catcher patents, had devised, for holding a man in his seat in an airplane, the precise type of reel and mechanism described say, in Ham, they could get a valid patent on it. Yet that is what appellee's argument amounts to. As the Supreme Court said in Graham v. John-Deere Co., 1966, 383 U.S. 1, at p. 36, 86 S.Ct. 684, at p. 703, 15 L.Ed.2d 545:

"It is also irrelevant that no one apparently chose to avail himself of knowledge stored in the Patent Office and readily available by the simple expedient of conducting a patent search—a prudent and nowadays common preliminary to well organized research. Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856 (1900)."

Indeed, appellee's theory would permit it to get its patents even though it had actually used the trolley catcher patents in devising its "man-sensitive" reels. One major purpose of the patent law is to make freely available to the public whatever is disclosed in the patent, once it has expired. Appellee's argument flies in the teeth of that purpose.[6]

6. See General Electric Co. v. Jewel Incandescent Lamp Co., 1945, 326 U.S. 242, 249, 66 S.Ct. 81, 90 L.Ed. 43; William T. Alvarado Sales Co. v. Rubaloff, 9 Cir., 1959, 263 F.2d 926, 928; Griffith Rubber Mills v. Hoffar, 9 Cir., 1963, 313 F.2d 1, 3.

■ The trial court also found that the trolley catchers are heavy and bulky devices, and that substantial redesign and reconstruction would be necessary to adapt a trolley catcher to serve as a "man-sensitive" safety apparatus. But these distinctions do not confer patentability over the prior art. Neither reducing the size nor changing the materials used, nor modifying tolerances, weights or balances to adapt the devices to the more rigorous and precise demands of an airplane safety device would constitute the kind of invention that the patent laws are designed to protect. (Cf. 35 U.S.C. § 103, supra, n. 4).

The trial court further found that the trolley catchers are not multi-directional devices whereas the patented "man-sensitive" safety apparatus "senses the movement of a man in any direction with respect to his seat" and locks the man in his seat in the event of abnormal movement in any direction. This finding has no support in the evidence. Nowhere in the claims in suit is there any reference to this so-called "multi-directional" feature. Moreover, in the case of the trolley catchers, as in appellee's devices, the cord emerges from a hole or hub in the casing of the reel, and it makes no difference whether the cord is pulled straight out or at an angle. What causes the reel to lock is acceleration, regardless of the angle at which the cord is pulled.

■ Appellee seems to assert that appellants are estopped to assert the trolley catchers as prior art because appellants knew about them when they obtained the Spielman patent, but did not cite them to the Patent Office. (See Admiral Corp. v. Zenith Radio Corp., 10 Cir., 1961, 296 F.2d 708, 716–717). While this might, as indicated in the cited case, affect the validity of Spielman, a question not before us, we do not think that it can be used to sustain the validity of Pfankuch or Cushman, with which appellants had nothing to do. The public has too great an interest in the validity of patents to permit the sort of "estoppel" that appellee urges. Cf. M. O. S. Corp. v. John I. Haas Co., 9 Cir., 1967, 375 F.2d 614, 616, and cases there cited.

■■ We think it clear that, if the trolley catcher reels had been designed later than the Pfankuch and Cushman devices, the claims here in suit would read directly on such trolley catcher reels. It is settled that " 'that which infringes, if later, would anticipate, if earlier.' " Knapp v. Morss, 1893, 150 U.S. 221, 228, 14 S.Ct. 81, 84, 37 L.Ed. 1059; Sperry Rand Corp. v. Knapp-Monarch Co., 3 Cir., 1962, 307 F.2d 344, 348. Thus the trolley catchers must be held to anticipate the Pfankuch and Cushman claims that are here in suit.[7]

Moreover, we cannot believe that, if appellee's skilled engineers had considered the trolley catchers when they were working on what became the Pfankuch and Cushman devices, they would not have at once realized the relevance of those earlier devices to the problem at hand. At the least, the claims in suit fall under the ban of 35 U.S.C. § 103, supra, n. 4. See Graham v. John Deere & Co., supra; M. O. S. Corp. v. John I. Haas Co., supra, at 375 F.2d 620, and cases there cited.

■■ Finally, appellee relies heavily upon the presumption of validity that attends a patent, and upon commercial success of its patented devices. The presumption, however, is insufficient in the face of pertinent prior art patents not considered by the Patent Office. Jacuzzi Bros., Inc. v. Berkeley Pump Co., 9 Cir., 1951, 191 F.2d 632, 634. And commercial success, while pertinent in considering whether the invention is novel, is insufficient to sustain a patent that is clearly invalid. Graham v. John Deere & Co., supra, at 383 U.S. 17–18, 35–36, 86 S.Ct. 684; Great A & P Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162; Monroe Auto Equipment Co. v. Superior

---

7. We express no opinion as to the validity of other claims in these patents.

Industries, Inc., 9 Cir., 1964, 332 F.2d 473, 480.

The judgment is reversed, with directions to enter a judgment dismissing the action.