**HIGH VOLTAGE ENGINEERING COR-PORATION, Plaintiff,**

v.

**BOISE CASCADE CORPORATION, Defendant,**

**Ford Motor Company and Nuclear-Chicago Corporation, Intervenors.**

**Civ. No. 1–68–79.**

United States District Court, D. Idaho, S. D.

Feb. 5, 1970.

Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, Del., Russell & Nields, Boston, Mass., McLean, Morton & Boustead, Washington, D. C., Langroise, Clark & Sullivan, Boise, Idaho, for plaintiff.

Alexander L. Nichols, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Eberle & Berlin, Boise, Idaho, William K. Kerr, Albert E. Fey, Gaynell C. Methvin, Fish, & Neave, New York City, for defendant.

MEMORANDUM DECISION

McNICHOLS, District Judge.

Plaintiff brought this action alleging infringement of two patents, concededly

in the ownership of the plaintiff corporation. Trial before the court, sitting without a jury, began on May 19, 1969. Four days of testimony was heard, a transcript thereof procured, and briefs have been filed. The court has been favored with meticulously complete proposed findings of fact by the respective parties, which proposed findings are keyed to the transcript of oral evidence and to an extensive list of exhibits admitted into evidence. The matter stands submitted for determination on the merits.

The patents in issue are:

1. *Burrill Patent*: United States Patent No. 2,680,815, issued to E. A. Burrill, June 8, 1954, entitled "Method of and Apparatus for Treating Substances with High Energy Electrons" (hereinafter the "Burrill Patent"). For the purpose of this litigation, plaintiff relies on claim 3 of the Patent which reads:

"3. The method of delivering the ionizing energy of a beam of high-energy electrons to substances to be irradiated, with maximum energy efficiency and minimum side effects due to excess dosage, which method comprises the following steps: creating a beam of high-energy electrons in an evacuated region; directing said beam of high-energy electrons out of said evacuated region and onto the surface of the mass of the substance to be irradiated by said high-energy electrons; and distributing during the irradiation the intensity of the action of the high-energy electrons on the mass of the substance being irradiated by subjecting said beam to the action of an electron-deflecting field; causing said field to vary cyclically in time in such a manner that the path of intersection of said beam and the incident surface of the mass of the substance being irradiated repeatedly describes an elongated, substantially rectilinear pattern; and, in so varying said

field, causing said field to vary in such a manner that the velocity with which said beam moves along said pattern from one extremity thereof to the opposite extremity thereof is substantially constant."

2. *Robinson Patent*: United States Patent No. 2,729,748, issued to D. M. Robinson, January 3, 1956, entitled "Apparatus for Sterilizing Foods, Drugs and Other Substances by Scanning Action of High-Energy Electrons" (hereinafter the "Robinson Patent"). For the purpose of this litigation, plaintiff relies on claims 6, 7 and 8 of the patent, which read:

"6. Apparatus for irradiating foods, drugs and other materials with high-energy electrons, comprising in combination, an acceleration tube having at one end portion cathode means for creating a beam of high-energy electrons from which the beam is discharged lengthwise said tube, said tube terminating at its opposite end in a flared portion ending in an elongated, narrow, exit window, and *means* for imparting a scanning movement to said electron beam within said flared portion in a path substantially coinciding with the longer axis of said exit window, for discharge through said window in such scanning path.

"7. Apparatus for irradiating foods, drugs and other materials with high-energy electrons, comprising in combination, an acceleration tube having at one end portion cathode means for creating a beam of high-energy electrons from which the beam is discharged lengthwise said tube, said tube terminating at its opposite end in a flared portion ending in an elongated, narrow, exit window and *alternating current means* for imparting a scanning movement to said electron beam within said flared portion in a path substantially coinciding with the longer axis of said exit window, for

discharge through said window in such scanning path.

"8. Apparatus for irradiating foods, drugs and other materials with high-energy electrons, comprising in combination, an acceleration tube having at one end portion cathode means for creating a beam of high-energy electrons from which the beam is discharged lengthwise said tube, said tube terminating at its opposite end in a flared portion ending in an elongated, narrow, exit window, and *alternating current electromagnets at the opposite faces of said flared portion* for imparting a scanning movement to said electron beam within said flared portion in a path substantially coinciding with the longer axis of said exit window, for discharge through said window in such scanning path." (Emphasis is supplied to denote the verbiage used to differentiate one claim from another.)

Plaintiff, High Voltage Engineering Corporation (hereinafter "High Voltage"), is a Massachusetts corporation having its principal place of business in Burlington, Massachusetts.

Defendant, Boise Cascade Corporation (hereinafter "Boise Cascade"), is a Delaware corporation having its principal place of business in Boise, Idaho.

Defendants-intervenors are Ford Motor Company (hereinafter "Ford"), a Delaware corporation having a principal place of business at Dearborn, Michigan, and Nuclear-Chicago Corporation (hereinafter "Nuclear-Chicago"), a Delaware corporation having a principal place of business at Des Plaines, Illinois, and whose Texas nuclear division (hereinafter "Texas-Nuclear"), has a principal place of business at Austin, Texas.

The installation alleged to infringe the patents in suit is operated by Boise Cascade, at Boise, Idaho, in this district, and the electronic components thereof were manufactured by Texas-Nuclear at the behest of Ford.

The court has jurisdiction over the subject matter of this action by virtue of the patent laws of the United States (Title 35 U.S.C.); jurisdiction and venue are based on Title 28 U.S.C. § 1338(a) and § 1400.(b), respectively.

The issues are posed by the complaint of the plaintiff claiming infringement of the two patents and by the answer and counterclaim of the defendants and intervening defendants denying infringement and affirmatively alleging invalidity of the patents.[1] By stipulation the infringement issue at this trial was specifically limited to the irradiation apparatus installed in the plant of Boise Cascade at Boise, Idaho.

A careful review of the evidence discloses, and I find, that the following factual situation is established.

Both the Burrill and the Robinson patents relate to improvements in electronic accelerators; both are combination patents; Burrill is essentially a method patent and Robinson an apparatus patent.

An electronic accelerator, as the same relates to the case at bar, classically consists of an elongated tube (usually oriented vertically) from which air is evacuated to create a vacuum chamber. Mounted at the top is an electrode (cathode) which, when connected to an

1. Other issues initially involved were disposed of as follows:
    (a) U.S. patents No. 2,602,751 and No. 2,887,854 were withdrawn from suit prior to trial.
    (b) After trial, by order dated June 6, 1969, John G. Trump was designated as a joint inventor with Denis M. Robinson, in the subject matter of U.S. Patent No. 2,729,748 (the Robinson patent in suit). The records of the U.S. Patent Office were corrected to conform to the court's order in accordance with the provisions of 35 U.S.C. § 256. On October 21, 1969, a certificate reflecting this correction was appended to the original patent records by the Patent Office.

external source of electrical energy and heated thereby, becomes charged negatively and emits electrons. At the opposite or bottom end of the tube is a positively charged electrode (anode) which attracts the electrons emitted by the cathode. Along the inner wall of the tube, located between the cathode and anode, is mounted a series of electrodes which are electrically charged at successively higher voltages. As the electrons emitted from the cathode pass downward toward the anode the rate of speed at which the electrons are moving is accelerated by the successively higher voltages of the annular electrodes.

The energy with which the electron is so accelerated is determined by the difference in voltage between the cathode and the anode. This difference is measured in electron volts. While the voltage of accelerators varies widely, the patents in suit involve so-called "high energy" accelerators. For our purpose high energy or high voltage is construed to range from several hundred thousand electron volts upwards to several millions of volts.

As the beam of accelerated electrons passes downward toward the anode the beam can be converged or diverged by the use of electromagnets depending on the characteristic of the magnetic field. Thus the beam may be focused or concentrated, or be defocused or diffused. Likewise, with the use of magnetic or electrostatic fields at right angles to the electron beam, it may be deflected or bent. If the magnetic or electrostatic field is established first in one direction and then in the other, the electronic beam may be deflected first to one direction and then to the other resulting in a sweeping motion back and forth. This procedure, which is referred to as "scanning" the beam, is highly relevant to this litigation.

Where as here, the beam of electrons so produced and affected is to be utilized outside of the vacuum chamber, the anode is usually in the form of a thin metallic sheet or "window", often hereinafter referred to as an "exit window".

In the mid-1940s High Voltage was formed to design and manufacture accelerators, including electronic accelerators. The organizers and associates in the new venture were scientists who were identified with Massachusetts Institute of Technology (M.I.T.) where a great deal of study in the acceleration of electrons had taken place. High Voltage personnel included Denis M. Robinson (of the Robinson patent), Ernest A. Burrill (of the Burrill patent), John G. Trump (co-inventor of the Robinson patent, see footnote 1, supra) and R. J. Van de Graaf among others. Van de Graaf had developed a very sophisticated high-energy electron accelerator and the Van de Graaf accelerator was specifically mentioned in both patents in suit as a potential basic accelerator to which the invention was adaptable.

It is well established by the evidence that, at the time of both the Burrill and Robinson claims of invention, electronic accelerators, capable of producing high-energy electrons, the beams of which could be focused, scanned and emitted from an exit window so as to treat materials exposed to the beam, were old and well understood in the art. Indeed the parties are not in dispute on this point.

Sometime in the year 1949 Liggett and Myers Tobacco Company determined to explore means for sterilization of its packaged and cartoned cigarettes. An agent, Arthur D. Little Company, was commissioned to canvass the technical field to ascertain the most feasible sterilization method. It was determined that electronic beam irradiation offered the best potential. Liggett and Myers contemplated the sterilization of approximately 1.7 million cartons of cigarettes per day utilizing an electronic voltage in the nature of 3 million volts. Plaintiff was approached in the latter part of the year 1949 by Arthur D. Little asking that consideration be given to the type of equipment required for the proposed sterilization program.

Burrill was initially assigned by High Voltage to the problem. By January 10,

1950, Burrill made the claims of invention herein involved in the Burrill patent based on entries in his laboratory notebook. Robinson and Trump were in frequent contact with Burrill relative to the sterilization of cigarettes by electron beam radiation. Robinson determined that, as a result of some suggestions by Trump, he saw additional inventive improvements in apparatus compatible with Burrill's method claims and the Robinson patent in suit was applied for almost simultaneously with the application of Burrill to the Patent Office.

## THE BURRILL PATENT DISCLOSURES

Basically the Burrill patent in suit is a method patent utilizing magnetic, electronic and other methods for distributing the intensity of a high-energy electronic beam so as to utilize more efficiently the energy of the beam in the treatment of substances to be irradiated. The method, it is clear, refers to scanning the beam back and forth to irradiate uniformly the substance to be treated. While emphasis is placed on the sterilization of food, drugs and packaging material and other materials, the specifications of the patent are not limited to sterilization, as such, but generally cover treatment of materials by irradiation.

Burrill makes the point that the intensity of an electron beam varies across its cross-section, being relatively more intense at the center and relatively less intense at the edges. It is also pointed out in the patent that the materials to be treated may be wider than the cross-section of the beam. The patent states that if one desires to assure that all of the material is uniformly irradiated, and if one wants to minimize the effect of the uneven distribution of intensity across the cross-section of the beam, the beam should be moved back and forth across the surface to be irradiated, thus achieving uniform irradiation and hence uniform treatment.

The Burrill patent contemplates that the material to be treated will be transported on a conventional conveyor arrangement beneath the exit window of the electron accelerator, and that the electron beam be swept or scanned back and forth across the width of the conveyor to assure that the material on the conveyor is uniformly irradiated. The beam may be scanned, according to the patent, by deflection of the beam magnetically through the use of an alternating magnetic field at right angles to the beam or by the use of an alternating electrostatic field likewise arranged at right angles to the beam.[2]

The Burrill patent further states that the electronic beam can be scanned back and forth most simply by a so-called sinusoidal field, but that a "sawtooth" method of oscillation may also be used with probable better uniformity of distribution of the beam to the material to be treated.

Plaintiff relies on claim 3 of the Burrill patent (set out verbatim above). As indicated, claim 3 is a method, as distinguished from an apparatus claim. It is directed to causing the electron beam to be swept back and forth by the action on it of an electron deflecting field in such a way that the beam moves back and forth with substantially constant velocity, and describes an elongated rectilinear pattern (a long straight line as would be described by the sawtooth wave scanning pattern) on the material being irradiated.

## THE ROBINSON PATENT DISCLOSURES

The Robinson patent in suit (now "Robinson-Trump", but for consistency herein continued as "Robinson") is an

2.  Additional methods of achieving uniform irradiation are suggested: i. e. (1) holding the beam constant and shifting the conveyor back and forth, (2) moving the cathode back and forth, (3) moving the complete accelerator back and forth and (4) a combination of movement of the conveyor and accelerator. These proposals are not of importance to determination of this case.

apparatus patent and can best be understood when it is stated that the apparatus is suited to be used in conjunction with the method patent of Burrill here in suit. The apparatus is therefore designed to be used in the irradiation of materials through the use of an electronic accelerator (the Van de Graaf accelerator being specifically mentioned) producing an electron beam which is scanned, outside of the vacuum tube, over the area or material to be irradiated. Plaintiff relies on claims numbered 6, 7 and 8 of the patent (set out verbatim above). Each of the claims recites the provision for a conventional accelerator, the Burrill patent's scanning coils and a "scanning horn" with an elongated exit window. Thus for purpose of this suit the claimed invention of Robinson is contained in the scan horn disclosure. This is the flared portion at the bottom of the accelerator tube. The flared portion terminates in a long narrow exit window covered with aluminum foil. The scanning horn allows the electron beam to most efficiently exit the evacuated chamber of the electronic accelerator at all points on its back and forth scanning travel. This Robinson felt to be inventive. Additionally, the scanning of the beam over the long, narrow window had the claimed advantage of distributing the heat generated by the passage of the beam through the window, thus minimizing potential heat damage to the window.

### THE STATE OF THE PRIOR ART

The elements of both patents in issue are shown by the evidence to be well known and understood prior to the dates of patent application.

The electronic beam accelerator, with focusing magnets, is most fully disclosed by the prior patent to Van de Graaf, United States Patent No. 2,608,-664, filed September 18, 1945. Both patents in suit acknowledge adaptability to the Van de Graaf accelerator.

United States Patent No. 2,036,532, to Knoll, issued in 1936, and not cited by the Patent Office in either patent in suit, discloses a cathode ray vacuum tube, a focusing magnet, beam deflecting means to scan the electron beam, together with a thin electron permeable exit window through which the beam was allowed to pass. Knoll discloses a rapidly scanned ray working outside of the vacuum tube. He teaches that the distance between the exit window and the object on which the beam is intended to impinge should be of the shortest length to minimize dispersion of the beam by the atmosphere. Also Knoll recognized and taught that rapid scanning of the beam reduced the destructive effect of the heat generated by the focused beam on the exit window. In order to achieve substantially constant velocity of the electron beam as it is scanned back and forth, Knoll impresses a sawtooth wave on his electrostatic deflecting plates. He indicates that this deflection or scanning function may be accomplished by magnetic fields as well as by the electrostatic deflection plates he prefers. Thus Knoll embodies into his invention an electron beam which is focused by a focusing coil, rapidly scanned by magnetic or electrostatic means within the vacuum tube in a sawtooth wave and then released through an electron permeable window.

The patent to Kern, United States Patent No. 2,181,126, issued in 1940, and likewise not cited by the Patent Office in either patent in suit, discloses what in the art is known as a "Leonard"[3] ray tube head. Kern shows an electron accelerator tube in which the beam is scanned within the vacuum and passes into the atmosphere through an electron permeable window. The tube is provided with a flared end and an elongated narrow slot which defines the contours of the permeable window. Kern teaches the desirability of successively deflecting the electron beam so that it follows a substantially linear path. The scan-

3. So named for P. Leonard who brought cathode rays out through the wall of a cathode ray tube in 1894.

ning occurs inside the vacuum tube and the permeable window is long and narrow. Kern notes that the length of the slot forming the window is immaterial, the dimensions being determined by the desired width of the sweep or deflection of the electron beam.

The Dimmick United States Patent, No. 2,465,713, issued in 1947, and again a patent not cited by the Patent Office as to either patent in suit, describes an apparatus for the scanning of an electron beam back and forth on the surface of an optical lens to uniformly treat the exposed surface. Dimmick recognized the lack of uniformity in energy output throughout the cross section of the beam and taught the technique of scanning a high intensity beam of relatively small size rapidly across the area to be bombarded. Dimmick used an electron gun, with a cathode beam, a focusing coil, and beam deflecting coils in conjunction with which he utilized the impression of a sawtooth wave on his scanning coils. It must be noted that the electron beam of the Dimmick disclosure remains in the evacuated chamber and therefore has no exit window arrangement. It is further pertinent to note that Robinson, in 1965, as president of plaintiff corporation, speaking of both the Burrill and Robinson patents in suit, advised his patent counsel that he would not like to go to court on the use of an electron beam accelerator used for irradiating substances if the opponents had the Dimmick patent in evidence.

A British patent, No. 299,735, issued to Plausen in 1928, once more not cited by the Patent Office in the prosecution proceedings of the patents in suit, illustrates accelerated electrons, of a suggested voltage in the range of 300,000 to 700,000 volts, which are permitted to escape through a thin metallic window. The electron beam is then used to study the chemical reaction on various materials exposed to the rays. Among his suggestions is the sterilization of foodstuffs by irradiation. Plausen describes the use of a water jacket surrounding the exit window area to aid in dispersal of the heat generated as the electrons pass through the window.

In a publication "Electronic Preservation of Foods" by Wolfgang Huber, published in the March, 1948 issue of *Electronics,* the author described the use of high energy electrons, in the order of 3,000,000 volts, for the purpose of sterilizing food and drugs. Huber's article discussed the use of a system of magnets to bend the beam prior to releasing it through a window so as to impinge on a material being moved on a conventional conveyor. The article suggested the advantages of the use of high voltages and great electron intensities applied for a very short time period which had the effect of sterilization without change in taste, odor or appearance of the treated material. Huber's article relied to a considerable extent on the teachings of the U. S. patent to Brasch, No. 2,429,217, cited by the Patent Office in both patents in suit.

The July, 1948 publication, "Irradiation of Biological Materials by High Energy Roentgen Rays and Cathode Rays", by Trump and Van de Graaf, published in the *Journal of Applied Physics,* discussed the potential of sterilizing food and drugs with sharply focused high energy electron beams (up to 3,000,000 volts) using a Van de Graaf accelerator. Magnetic focusing of the beam and magnetic deflection were also taught. While this Trump and Van de Graaf article was not specifically cited by the Patent Office, the prior work of Van de Graaf in this field was acknowledged in the specifications of the patents in suit.

The foregoing references best reflect the state of the prior art when Burrill and Robinson first claimed the inventions represented by the patents in suit. The patents cited by the Patent Office against the applications of the patents in suit are not as pertinent as the prior art references of the defendants hereinbefore reviewed. Any presumption of validity resting on the issuance of the patents by the Patent Office is rebutted by the showing that

pertinent prior art references were not considered by the Patent Office. Aerotec Industries of Calif. v. Pacific Scientific Company, 381 F.2d 795 (C.A. 9, 1967); Bentley v. Sunset House Distributing Corp., 359 F.2d 140 (C.A. 9, 1966).

Much of the relevant prior art dealt with cathode ray devices of appreciably lower power levels than the power levels of the electron accelerators underlying plaintiff's patents. However, the evidence makes it clear that the electron beam, whether of high or low energy, reacts similarly and quantitatively to magnetic or electrostatic focusing or deflecting fields. The strength of the focusing or deflecting fields must be correspondingly increased with an increase in beam energy. This was well known prior to the inventive claims of Burrill or Robinson.

My comparison of the state of the prior art with the specifications and claims of the patents in suit leads me to conclude that the evidence in this case overwhelmingly shows that all the elements comprising each of the combination patents in suit were old and well known prior to the developments and improvements claimed by Burrill and Robinson.

In 1965, the Supreme Court, "after a lapse of fifteen years", re-examined the question of patentability of inventions. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545; United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572. It was held that a valid patent must meet all of the three specific statutory conditions of patentability defined in 35 U.S.C. §§ 101, 102 and 103, i. e., novelty, utility and non-obviousness.

"The entire tenor of the *Graham* decision is that there should be strict observance of all three explicit conditions precedent to the issuance of a patent, namely novelty, utility and nonobviousness, with special emphasis being placed on the latter." Jeddeloh

Brothers Sweed Mills, Inc. v. Coe Manufacturing Company, 375 F.2d 85, 87 (C.A. 9, 1967).

It is well settled that a combination of old elements may constitute a patentable invention, 35 U.S.C. § 101; it is equally well settled that a combination of old parts or elements performing or producing no new or different function or operation does not constitute a patentable invention. Great A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). In *A. & P. Tea Co.*, at pages 152 and 153, 71 S.Ct. at p. 130, the court said:

"* * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. * * *"

"* * * *

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

The teaching of *A. & P. Tea Co.* has not been eroded by the subsequent 1952 Congressional revamping of the patent law, nor by the review thereof by the Supreme Court in *Graham*. Hensley Equipment Company v. Esco Corpora-

tion, 375 F.2d 432 (C.A. 9, 1967); Jeddeloh Brothers Sweed Mills, Inc. v. Coe Manufacturing Company, supra. *Hensley* and *Jeddeloh* reiterate that the tests of patentability are to be applied "with special strictness" in determining the patentability of combination patents.

In testing the patentability of a combination patent this circuit has further held that combinations of old elements must perform additional and different functions in the combination than were performed out of it, "the results must be unusual and surprising". Griffith Rubber Mills v. Hoffar, 313 F.2d 1, 4 (9 C.A., 1963).

As in a majority of patent cases, the controversy here really centers around the non-obvious subject matter provision of 35 U.S.C. § 103 as the same is to be interpreted in view of the foregoing legal precedents. A patent may not be obtained (or held valid) "if the differences between the subject matter to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains".

▪ The validity of each patent in suit then is to be determined by a strict application of these well established criteria:

(a) Does the combination of old and well-known elements produce a new and useful result, or differently stated, does the function of the combination exceed the sum of the parts; and,

(b) If so, was the claimed invention non-obvious to one having ordinary skill in the art.

I am satisfied and therefore hold that neither the Burrill nor the Robinson patent in suit can stand up to either test.

▪ For Burrill, plaintiff contends that the patent discloses a new and different method of uniformly and efficiently irradiating a large area outside of the evacuated tube by uniformly scanning a relatively concentrated electron beam back and forth in a steady linear pattern by electromagnetic or electrostatic deflection. All of the elements of this method are clearly taught in the prior art as the detailed examination of the same has disclosed. The method proposed by Burrill contains improvements: he increases the energy utilized and he broadens the sweep of the beam. But mere improvement is not invention. The hard fact remains that nothing new is demonstrated; the resultant is only the sum of the parts.

▪ Neither can Burrill's claims of invention be said to be unobvious. The prior art taught all that he has accomplished. Having available to him that prior art, I conclude that one skilled in electronic subject matter would have been able to produce the method described by Burrill. The conclusion follows that the combination was reasonably obvious to one skilled in the art.

▪ The Robinson apparatus is claimed to be an addition to the Burrill disclosures, which I have found to produce no new and patentable combination and to have been unpatentable as obvious. On behalf of Robinson it is contended that a new and different, and thusly patentable, apparatus known as a scan horn is disclosed. This apparatus permits the scanning of an electron beam back and forth inside the vacuum and provides the elongated, narrow window device which allows a much larger total amount of energy to exit the window in a concentrated beam which, while rapidly scanning the area to be treated, provides a deep penetration evenly applied to the area being irradiated. Again all of the elements of this device are taught by the prior art. It appears that all of the elements may not have been utilized together in as efficient a fashion, but the end result in nowise exceeds the sum of the parts. Nothing new or different is accomplished by the combination of old lore and no patentable invention is shown.

The conclusion then follows that the combination apparatus disclosed by the Robinson patent, being fully taught in the prior art, was obvious to one skilled in the subject matter field.

The court concludes, based on a preponderance of the evidence in the case, that:

1. As to the Burrill patent in suit, No. 2,680,815, and specifically as to claim 3 thereof, is invalid and void under 35 U.S.C. § 103, for the reason that the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the alleged invention was made to a person having ordinary skill in the art.

2. As to the Robinson patent in suit, No. 2,729,748, and specifically as to claims 6, 7 and 8 thereof, the same is invalid for the reason that the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the alleged invention was made to a person having ordinary skill in the art.

3. That the patents having been determined to be invalid, the issue of infringement need not be resolved.

4. That the complaint should be dismissed and a judgment, including costs, entered for the defendants and intervening defendants on their counterclaim.

5. That the defendants and intervening defendants are entitled to injunctive relief.

This memorandum opinion will serve as Findings of Fact and Conclusions of Law of the court as authorized by Rule 52(a), Federal Rules of Civil Procedure. No party is foreclosed from resort to the provisions of Rule 52(b), Federal Rules of Civil Procedure, relative to requests for additional or amended findings.

Counsel for the defendants will promptly prepare, serve and lodge a proposed form of judgment in conformance with this opinion.